IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL JIROUSEK, | ) | Case No. 1:17-cv-2331 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Michael Jirousek, seeks judicial review of the final decision of the

Commissioner of Social Security denying his applications for disability insurance benefits and

supplemental security income under Titles II and XVI of the Social Security Act.  This matter is

before the court pursuant to 42 U.S.C. § 405(g) and 1383(c)(3), and the parties consented to my

jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 11.  Because the ALJ

applied proper legal standards and reached a decision supported by substantial evidence, the

Commissioner's final decision denying Jirousek's applications for disability insurance benefits

and supplemental security income must be AFFIRMED.

## II.      Procedural History

On June 19, 2014, Jirousek applied for disability insurance benefits and supplemental

security income.  ECF Doc. 14, Page ID# 1375; (Tr. 192–207).  Jirousek alleged that he became

disabled on March 15, 2010, due to schizoaffective disorder,[1] anxiety, intermittent explosive disorder,[2] compulsive personality disorder,[3] and PTSD.[4]  (Tr. 73, 89, 192, 199).  The Social Security Administration denied Jirousek's applications initially and upon reconsideration.  (Tr. 73–104, 107–38).  Jirousek requested an ALJ hearing.  (Tr. 159–60).  Administrative Law Judge ("ALJ") Joseph G. Hajjar heard Jirousek's case on August 5, 2016, and denied his claim in an October 3, 2016, decision.  (Tr. 11–21, 39–72).  On October 10, 2017, the Appeals Council denied Jirousek's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1–4).  On November 7, 2017, Jirousek filed a complaint to seek judicial review of the Commissioner's decision.  ECF Doc. 1.

---

[1] "Schizoaffective disorder is a mental condition that causes both a loss of contact with reality (psychosis) and mood problems (depression or mania)."  *Schizoaffective Disorder*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/000930.htm (last visited Dec. 27, 2018).  Common symptoms include: changes in appetite and energy, disorganized or illogical speech, delusions, paranoia, depression, irritability, insomnia, difficulty concentrating, hallucinations, and social isolation.  *Id.*

[2] "Intermittent explosive disorder involves repeated, sudden episodes of impulsive, aggressive, violent behavior or angry verbal outbursts in which [a person] react[s] grossly out of proportion to the situation."  *Intermittent Explosive Disorder*, MAYOCLINIC.ORG, https://www.mayoclinic.org/diseases-conditions/intermittent-explosive-disorder/symptoms-causes/syc-20373921?p=1 (last visited Dec. 27, 2018).

[3] "Obsessive-compulsive personality disorder (OCPD) is a mental condition in which a person is preoccupied with rules, orderliness, [and] control. . . . OCPD has some of the same symptoms as obsessive-compulsive disorder (OCD).  People with OCD have unwanted thoughts, while people with OCPD believe that their thoughts are correct. . . . A person with OCPD has symptoms of perfectionism that . . . may interfere with the person's ability to complete tasks, because their standards are so rigid."  *Obsessive-Compulsive Personality Disorder*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ ency/article/000942.htm (last visited Dec. 27, 2018).

[4] "Post-traumatic stress disorder (PTSD) is a type of anxiety disorder.  It can occur after [a person has] gone through an extreme emotional trauma that involved the threat of injury or death."  *Post-Traumatic Stress Disorder*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/000925.htm (last visited Nov. 14, 2018).

### III.    Evidence

#### A.    Personal, Educational and Vocational Evidence

Jirousek was born on December 13, 1985, and was 24 years old on the alleged onset date. (Tr. 192, 199).  Jirousek had a bachelor's degree in sports medicine.  (Tr. 46).  He did not have any past relevant work.  (Tr. 20, 68).

#### B.    Relevant Medical Evidence

On April 9, 2010, Jirousek was admitted to St. Vincent Charity Medical Center ("St. Vincent") after he had auditory and olfactory hallucinations.  (Tr. 444, 447).  Admitting physician Charles Hurst, Jr., M.D., noted that Jirousek was depressed and anxious, had OCD,[5] and had moderately severe psychotic symptoms.  (Tr. 447–48).  Jirousek reported that he hallucinated after he took medication that his psychiatrist prescribed.  (Tr. 484).  Attending physician Leslie Koblentz, M.D., diagnosed Jirousek with adjustment disorder with anxiety, and gave him a global assessment of functioning ("GAF") score of 50.[6]  (Tr. 468).

On November 12, 2010, Jirousek saw Myra Mark, M.D., for his anxiety.  (Tr. 540). Dr. Mark noted that Jirousek attended weekly counseling, and that he planned to get a master's degree in occupational therapy.  (Tr. 541).  Dr. Mark prescribed Jirousek an antianxiety medication.  (Tr. 542).  On December 20, 2010, Jirousek told Dr. Mark that his generic antianxiety medication did not work, and he requested Xanax.  (Tr. 544).  On January 20, 2011,

---

[5] Obsessive-Compulsive Disorder ("OCD") is "a mental disorder in which people have unwanted and repeated thoughts, feelings, ideas, sensations (obsessions), and behaviors that drive them to do something over and over (compulsions)."  *Obsessive-Compulsive Disorder*, A.D.A.M. Medical Encyclopedia (2018), *available at* Nat'l Inst. of Health, MedlinePlus, https://medlineplus.gov/ency/article/000929.htm (last visited Dec. 27, 2018).

[6] The GAF is a scale used to report an individual's overall functioning at a particular point in time.  AM. PSYCH. ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 30 (4th ed. 2000).  A score in the range of 41 to 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.*

Jirousek requested to see another doctor in Dr. Mark's specialty so that he could get Adderall and Xanax; however, he denied having anxiety, depression, panic, or other mental health symptoms. (Tr. 546–48). Medical records show that Jirousek continued to request Xanax[7] and Adderall,[8] once stating that he needed them to relax and study. (*See* Tr. 576, 579, 583–84, 599, 601, 605, 607, 609). He also repeatedly requested anabolic steroids, which his physicians denied. (Tr. 645, 647, 650, 652–53). On March 29, 2011, Jirousek reported that he was depressed, restless, and anxious because he could not find a job and his friend died. (Tr. 550–51).

On March 16, 2011, Jirousek was admitted to Windsor-Laurelwood because his behavior was "increasing[ly] disorganized, psychotic, or bizarre." (Tr. 311, 313, 905). Michael Ray, M.D., noted that Jirousek believed people were out to get him. (Tr. 311). Jirousek was agitated, unresponsive, unable to care for himself or hold a conversation, disoriented, easily upset, unable to sleep, and unable to concentrate. (Tr. 311–12). (Tr. 312). Jirousek was discharged on March 25, 2011, and Dr. Ray noted that Jirousek's antipsychotic, antianxiety, and insomnia medications "helped quite a bit." (Tr. 308). Dr. Ray noted that Jirousek's insight and judgment remained impaired, but he was less delusional, no longer confused, and able to care for his basic needs independently. (Tr. 308). Dr. Ray diagnosed Jirousek with psychosis[9] and "suspected first break

---

[7] Xanax is a brand-name for the antianxiety and panic medication, Alprazolam. *Alprazolam*, AHFS PATIENT MEDICATION INFORMATION, *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/druginfo/ meds/a684001.html (last visited Dec. 27, 2018).

[8] Adderall is the brand-name for a drug used to treat and control the symptoms of ADHD and narcolepsy. *Dextroamphetamine and Amphetamine*, AHFS PATIENT MEDICATION INFORMATION, *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/druginfo/meds/a601234.html (last visited Dec. 27, 2018). It is a nervous system stimulant, and it can cause addiction, unusual behavior changes, difficulty sleeping, irritability, and hyperactivity. *Id.*

[9] "Psychosis occurs when a person loses contact with reality. The person may have false beliefs about what is taking place or who one is (delusions), [or] see or hear things that are not there (hallucinations)." *Psychosis*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/001553.htm (last visited Dec. 27, 2018).

schizophrenia,"[10] and he noted that he could not rule out the possibility of substance-induced psychosis or bipolar disorder.  (Tr. 309).  He gave Jirousek a GAF score of 40 to 45.[11]  (Tr. 310).

On March 29, 2011, Jirousek's treatment providers at Jewish Family Services Association noted that he was paranoid, had little insight into his situation, and was unwilling to commit to any appointments or services.  (Tr. 350).  He had bizarre delusions, and his thought processes were tangential, concrete, and blocked.  (Tr. 355).  He denied any hallucinations.  (Tr. 355).  His judgment, insight, memory, attention, and concentration were impaired.  (Tr. 356).  Jirousek's antipsychotic dosage was reduced because he was over sedated.  (Tr. 357).  Jirousek said he had difficulty sleeping, a high energy level, and difficulty chewing and swallowing.  (Tr. 361–62).  On April 6, 2011, Jirousek denied paranoia and anxiety, and stated that his mood was "ok."  (Tr. 366).  He had a GAF score of 35.  (Tr. 372).  On April 11, 2011, Jirousek's father reported that Jirousek was worse on Abilify[12] than his old antipsychotic medication, could not sleep, slapped his parents, threatened his parents with a knife, and was suicidal and paranoid.  (Tr. 327).  On April 12, 2011, Jirousek's father again reported that Jirousek was paranoid, punched a wall, and would not eat.  (Tr. 325).  On April 18, 2011,

---

[10] "Schizophrenia is a mental disorder that makes it hard to tell the difference between what is real and not real.  It also makes it hard to think clearly, have normal emotional responses, and act normally in social situations."  *Schizophrenia*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/000928.htm (last visited Dec. 27, 2018).

[11] A GAF score in the range of 31 to 40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)."  AM. PSYCH. ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 30 (4th ed. 2000).  A score in the range of 41 to 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.*

[12] Abilify is the brand-name for Aripiprazole, a drug used to treat schizophrenia, mania, depression, and irritable behavior.  *Aripiprazole*, AHFS PATIENT MEDICATION INFORMATION, *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/druginfo/meds/a603012.html (last visited Dec. 27, 2018).

Jirousek reported that he had auditory hallucinations. (Tr. 323). His parents reported that his antipsychotic medications made him mean, and that he threw his phone against a wall. (Tr. 323). On April 21, 2011, Jirousek claimed that his parents poisoned his food, and that someone stole his organs, broke his phone, and contaminated his laundry. (Tr. 321). His antipsychotic dosage was increased. (Tr. 321). On May 23, 2011, Jirousek reported that he wanted to buy a car, get plastic surgery, and that the text on his job applications appeared to get bigger and smaller. (Tr. 382). Jirousek's doctor discontinued his Abilify because he received other antipsychotic medications from another provider. (Tr. 382). On May 26, 2011, Jirousek's father reported that Jirousek threatened suicide if his parents did not pay for plastic surgery, which he claimed he needed to join the Air Force. (Tr. 380). On August 3, 2011, Jirousek's father reported that Jirousek was facing underage pornography charges, was not paranoid or stunted, tried to arrange plastic surgery and purchase a car with his father's credit card, and remained aggressive with his mother. (Tr. 374–75).

On March 30, 2011, Jasmine Maan, M.D., noted that Jirousek had trouble sleeping and eating, punched his father at a restaurant because he was worried about people stealing his debit card, he pushed his mother at a barbershop, and believed doctors had injected him with E-coli when they gave him an antipsychotic. (Tr. 385). Dr. Maan changed Jirousek's antipsychotic medication because he had a decreased appetite and drooled, and she gave him a GAF score of 50. (Tr. 587). On April 21, 2011, Dr. Mann again changed Jirousek's medications because he had nosebleeds, was more violent, and continued to be paranoid. (Tr. 388). On examination, he had disorganized thought process was disorganized, paranoid and delusional thought content, poor insight and judgment, poor impulse control, and no reported hallucinations. (Tr. 388). On May 26, 2011, Jirousek told Dr. Maan that he felt better, but his parents reported that he continued to be aggressive toward his mother. (Tr. 390). He continued to have poor insight,

judgment, and impulse control.  (Tr. 390).  On June 3 and June 22, 2011, Dr. Maan noted that Jirousek took his medications regularly, but continued to be aggressive, paranoid, and delusional. (Tr. 392, 394).  Jirousek told Dr. Mann that he wanted to join the navy or a physician assistant program, and she noted that he may need a mood stabilizer to control his grandiose delusions. (Tr. 394).  On July 8, 2011, Dr. Maan noted that Jirousek's psychoses had improved; however, he was still aggressive and had grandiose ideas.  (Tr. 396).  On August 10, 2011, Dr. Maan noted that Jirousek's parents took him off his medications because he drooled and made clicking sounds.  (Tr. 400).  Jirousek said he was doing well, but his aggression continued.  (Tr. 400).

On April 22, 2011, Jirousek was admitted to Cleveland Clinic after he stopped taking his medicine, had delusions about his parents trying to poison him and the government watching him, and pushed his mother and father.  (Tr. 340, 554, 559).  Avtar Saran, M.D., noted that Jirousek had auditory hallucinations, which told him "to get out of the prison and save the green, green means the color of the nursing staff."  (Tr. 340, 559).  Jirousek was angry, hostile, argumentative, hypervigilant, and paranoid about medical staff.  (Tr. 340, 559).  Dr. Saran diagnosed Jirousek with chronic paranoid schizophrenia with acute exacerbation and gave him a GAF score of 40.  (Tr. 340, 559).  Registered Nurse ("RN") Marie King Barry, noted that Jirousek had poor reality testing, had a bizarre and flat affect, was aggressive toward medical staff, and presented a "high risk to harm others through violence."  (Tr. 341).  On April 23, 2011, Barry noted that Jirousek was alert and oriented, but his affect remained masklike, constricted, and bizarre.  (Tr. 342).  Jirousek told Barry that he believed someone gave him the wrong medicine at home, he wanted to drive home to get a new cell phone and get an airline ticket to Houston, and he planned to join the Air Force or become a physician's assistant.  (Tr. 342). Jirousek demanded that he get "the right pill," a cup of coffee, or a latte every few minutes. (Tr. 342).  When given medication, Jirousek believed his pills were fake and spit them out.

(Tr. 343). On April 24, 2011, Jirousek was aggressive regarding medication and threatened "to kick the doctor's ass." (Tr. 343–44). On May 18, 2011, RN Antonella Adhikari noted that Jirousek could converse, was cooperative, and denied auditory and visual hallucinations; however, he got angry after arguing with his parents. (Tr. 345–46).

On May 20, 2011, Shila Matthew, M.D., discharged Jirousek because he was stable, and noted that he tolerated his medication well. (Tr. 346–47, 567–68). At a follow-up on June 6, 2011, Dr. Matthew noted that Jirousek was still not doing well, and she adjusted his medications. (Tr. 581). On July 6, 2011, Jirousek was delusional, agitated, fidgety, and he told Dr. Matthew that he wanted to join the navy or air force so "he c[ould] shoot and kill people." (Tr. 614). Dr. Matthew noted that Jirousek was medication compliant, but he continued to have poor insight and judgment. (Tr. 614). On August 2, 2011, Dr. Matthew noted that Jirousek was not taking his antipsychotic medication, and he was irrational and psychotic on the phone. (Tr. 629). On October 3, 2011, Jirousek's father told Dr. Matthew that Jirousek was not taking his medication, and that he found a psychiatrist to prescribe him Adderall. (Tr. 639).

On May 27, 2011, Jirousek saw Larissa Elgudin, M.D., for a psychiatric evaluation. (Tr. 569–71). Dr. Elgudin noted that Jirousek was "still mildly paranoid" after his April admission, and that he continued to have poor reality testing and confusion. (Tr. 570). On examination, Jirousek was uncooperative. (Tr. 570). He had paranoid thought content, blocked thought processes, poor insight, and poor judgment. (Tr. 570). Dr. Elgudin diagnosed Jirousek with paranoid schizophrenia, gave him a GAF score of 45, and prescribed antipsychotic medications. (Tr. 571).

On June 9, 2011, Dr. Saran noted that Jirousek slept well, but he continued to be hostile to his parents. (Tr. 596). Jirousek denied having depression, anxiety, panic, agoraphobia, PTSD, mania, and obsessive/compulsive symptoms. (Tr. 596). Jirousek reported that he had auditory

hallucinations, and his insight and judgment were impaired. (Tr. 596). Dr. Saran gave Jirousek a GAF score of 50 and continued his medications. (Tr. 597).

On October 28, 2011, Bharat Shah, M.D., noted that Jirousek had improved functioning, better sleep and appetite, and better behavior at home after treatment. (Tr. 488). He noted that Jirousek did not have any agitation, aggression, suicidal or homicidal thoughts, hallucinations, or delusions, and his thought content was coherent and logical. (Tr. 488). He continued Jirousek's medications. (Tr. 488). On November 4, 2011, Dr. Shah adjusted Jirousek's medications to control for "sexual inappropriateness," and noted that Jirousek was anxious, frustrated, and aggressive. (Tr. 489). On November 11, 2011, Dr. Shah noted that Jirousek had good judgment, coherent thought, and no impulsivity, and that he planned to take the LSAT. (Tr. 490). Dr. Shah continued Jirousek's antipsychotic medications and instructed him not to take an ADHD[13] medication or any other medications without consulting him first. (Tr. 490). On December 16, 2011, Dr. Shah noted that Jirousek was occasionally irritable and irrational, but that he was overall calmer, less aggressive, coherent, and logical. (Tr. 491). On January 6, 2012, Dr. Shah noted that Jirousek still had some anxiety, but he had good judgment and no impulsivity. (Tr. 492). On January 20, 2012, Dr. Shah noted that Jirousek had some anxiety, depression, paranoia, inappropriateness, illogical thought processes, difficulty with reality testing, and a lack of insight into his condition. (Tr. 493). On February 24, 2012, Dr. Shah noted that Jirousek continued to lack insight, but he did not act aggressively or violently. (Tr. 494). He diagnosed Jirousek with schizoaffective disorder and generalized anxiety disorder. (Tr. 494). On March

---

[13] "Attention deficit hyperactivity disorder (ADHD) is a problem caused by the presence of one or more of these things: not being able to focus, being overactive, or not being able to control behavior. . . . Some people with ADHD have mainly inattentive symptoms. Some have mainly hyperactive and impulsive symptoms. Others have a combination of these behaviors." *Attention Deficit Hyperactivity Disorder*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2018), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/article/001551.htm (last visited Dec. 27, 2018).

23, 2012, Dr. Shah noted that Jirousek had problems with anxiety, anger, agitation, irritability, and insight, and that he stopped taking two of his medications. (Tr. 495). He noted that Jirousek's behavior might be related to his past anabolic steroid use, and he prescribed Jirousek an antianxiety medication. (Tr. 495).

On January 1, 2012, Jirousek was admitted to Akron General Medical Center ("AGMC") for treatment of his suicidal thoughts. (Tr. 402, 522). Bharatkumar Shah, M.D., noted that Jirousek was depressed, anxious, and agitated. (Tr. 402, 522). Jirousek had logical thought content and good judgment. (Tr. 404, 524). Dr. Shah diagnosed Jirousek with major depression and bipolar disorder, gave him a GAF score of 30,[14] prescribed medications, and referred him to psychotherapy. (Tr. 404, 406, 524, 526). On January 2, 2012, Dr. Shah adjusted several of Jirousek's medications and referred Jirousek for medication management. (Tr. 407–10, 527–30). At discharge on January 4, 2012, Dr. Shah noted that Jirousek was "significantly better" with medication. (Tr. 412, 532).

On February 3, 2012, a sheriff had Jirousek admitted to St. Vincent for psychiatric observation, after he was jailed for assaulting a police officer. (Tr. 419–20, 442, 431). On examination, Jirousek had a flat affect, and a nurse noted that he was a risk for domestic violence. (Tr. 425, 427). He had depression, anxiety, paranoia, delusions, bizarre behavior, and a history of suicidal ideation threats of violence. (Tr. 429). Jirousek was discharged after 16 hours because he did not appear to be a danger to himself or others. (Tr. 420). Jirousek was

---

[14] A GAF score in the range of 21 to 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day, no job, home, or friends)." AM. PSYCH. ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 30 (4th ed. 2000).

diagnosed with a mood disorder, bipolar disorder, impulse control disorder, and antisocial tendencies. (Tr. 431–32, 436). He had a GAF score of 51 to 60.[15] (Tr. 436–36, 440).

On April 11, 2012, Jirousek was admitted to AGMC after his mother caught him trying to overdose on pain relievers. (Tr. 498, 502). Jirousek told Dr. Shah that he felt like a failure, and was upset about unemployment, legal problems, and conflicts with his parents. (Tr. 502). On April 13, 2012, Dr. Shah noted that Jirousek was calm, pleasant, and doing better. (Tr. 509). He was not aggressive, agitated, or suicidal. (Tr. 509). He had an appropriate affect, coherent and logical thought content, and good judgment. (Tr. 509). Dr. Shah gave Jirousek Xanax and ordered a follow-up test for anabolic steroids. (Tr. 676, 678). On April 15, 2012, Maher Mansour, M.D., noted that Jirousek was doing fair, had a less sad mood, was paranoid, and had poor insight and judgment. (Tr. 507). Jirousek had fair cognitive functions and reality testing, but he displayed "significant ambivalence and grandiosity." (Tr. 507). He denied hearing voices, and he was not aggressive. (Tr. 507). On April 16, 2012, Jirousek was discharged "in a stable condition," and Dr. Shah recommended that he follow up with an addiction specialist. (Tr. 515).

From April 2012 through December 2012, Jirousek was in the sheriff's custody pending corruption of a minor charges, and he received mental health therapy through the Ravenwood Medical Center. (Tr. 1107–30). On April 19, 2012, Amy Freede, LSW, noted that Jirousek had a history of steroid and alcohol abuse, attempted suicide, and hallucinations. (Tr. 1107). On April 24, 2012, Linda Folan, LISW, noted that Jirousek said his jail would not give him his medication, and that he had a flat affect. (Tr. 1112). On May 31, 2012, a therapist noted that

---

[15] A GAF score in the range of 51 to 60 indicates "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupation, or school functioning (e.g., few friends, conflicts with peers or co-workers)." AM. PSYCH. ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 30 (4th ed. 2000).

Jirousek got into an altercation with an inmate and hit a sheriff's deputy. (Tr. 1115–17). Jirousek told the therapist that he panicked when the deputies intervened, and that he did not remember hitting one of them. (Tr. 1116–17). At a follow-up on June 5, 2012, Jirousek's therapist noted that he was calm, cooperative, and respectful, but he had little insight into the seriousness of his aggression when he assaulted the sheriff's deputy. (Tr. 1121). On August 9, 2012, Jirousek's therapist noted that he had unrealistic ideas regarding his future (*i.e.*, leaving jail within a few weeks and getting a Ph.D. in sports medicine). (Tr. 1124). On October 26, 2012, Jirousek told his therapist that he was concerned about discontinuing his medication because believed his medication was working, and that he felt more volatile off the medication. (Tr. 1127). On November 26, 2012, Jirousek told the jail nurse that he hallucinated and had trouble sleeping. (Tr. 1130). On December 14, 2012, Jirousek told his therapist that he believed he would be released once he was transferred to prison, and that he got accepted to Texas A&M for a Ph.D. in sports psychology. (Tr. 1129).

On January 15, 2013, Jirousek was incarcerated after he was convicted of unlawful sexual conduct with a minor, pandering, and importuning. (Tr. 1069; *see also* Tr. 867, 1030, 1146–47). Jirousek told prison medical staff that he hallucinated two weeks before he was incarcerated, and that he had a history of anabolic steroid use. (Tr. 781). Dr. Sandeep Sheth, M.D., held Jirousek's medications pending mental health evaluation, and Paul Yavornitzky, Ph.D., held Jirousek for mental health observation. (Tr. 1025, 1045). Dr. Yavornitzky noted that Jirousek reported violent tendencies, OCD, panic attacks, and paranoid schizophrenia. (Tr. 1029). Dr. Yavornitzky noted that Jirousek appeared tense, anxious, and formal; however, he did not appear paranoid or delusional and his thoughts were organized. (Tr. 1030). Dr. Yavornitzky stated that Jirousek did "not show substantial mental status variables associated with acute assault risk, apart from his tense and over-controlled yet anxious manner."

(Tr. 1030).  On January 16, 2013, Dr. Yavornitzky noted that Jirousek was still anxious, but was calm and did not appear to be in any distress.  (Tr. 1027).  He discussed discontinuing Jirousek's medication.  (Tr. 1027).  On January 18, 2013, Dr. Yavornitzky noted that Jirousek was calm and stable, and his prison facility privileges were expanded.  (Tr. 1028).  On January 23, 2013, Dr. Yavornitzky noted that Jirousek was doing well and was not experiencing any depression or OCD symptoms.  (Tr. 1026).  He stated that Jirousek was calm, not agitated, less anxious, stable, and not an assault risk.  (Tr. 1026).

On January 22, 2013, prison doctor Pomputius, M.D., noted that Jirousek was "mildly depressed"; his thought content was goal-directed, logical, and coherent; and he did not have any hallucinations or delusions.  (Tr. 838).  Dr. Pomputius noted that Jirousek was diagnosed with major depression and OCD, gave him a GAF score of 55, and prescribed medications to control his symptoms.  (Tr. 841).

Also on January 22, 2013, Jirousek saw Marc Pagano, Ph.D., for a mental status examination.  (Tr. 862–64).  Dr. Pagano noted that Jirousek did not appear distracted by internal stimuli.  (Tr. 862).  Jirousek's energy was sufficient, his mood was calm and polite, and he had goal-oriented and linear thought processes.  (Tr. 862).  Jirousek endorsed hallucinations, but Dr. Pagano did not note any problems with reality testing, delusional thinking, or perceptual distortions.  (Tr. 862).  Dr. Pagano noted that Jirousek had poor judgment and insight, and that he "often initiated discussion on topics that had minimal relevance to his current circumstances." (Tr. 863).  Dr. Pagano stated that Jirousek's behavior during the examination "showed scant evidence of" schizoaffective disorder, bipolar disorder, OCD, intermittent explosive disorder, and narcissistic personality disorder.  (Tr. 864).  Instead, Dr. Pagano stated that Jirousek's behavior and issues seemed more likely related to personality disorder and adjustment issues. (Tr. 864).

Also on January 22, 2013, Jirousek also saw therapist Samantha Hovanic, LISW. (Tr. 857–61). Hovanic noted that Jirousek was alert, oriented, cooperative, organized, focused, attentive, logical, and emotionally stable during the evaluation. (Tr. 857). She also noted that Jirousek likely malingered olfactory hallucinations, and that he did not meet criteria for bipolar disorder. (Tr. 860). She diagnosed Jirousek with narcissistic personality disorder and OCD, and she gave him a GAF score of 75.[16] (Tr. 860).

On June 1, 2013, Jirousek was placed on continuous observation after he presented to the prison clinic with red wrists and refused to cooperate with treatment providers. (Tr. 763, 778). Jirousek also told a corrections officer "to get a gun and bullets and to go ahead and shoot him." (Tr. 778). On June 21, 2013, prison psychologist Janice Peterson, Ph.D., noted that Jirousek asked for and took medication while in segregation, but that he stopped medication due to reported side effects. (Tr. 836).

On January 23, 2014, Jirousek saw mental health counselor Terra Howell, PCC. (Tr. 1131–32). Jirousek told Howell that he hoped to have his sentence reduced, so that he could return home to work as an athletic trainer at a hospital and attend graduate school. (Tr. 1131). Howell diagnosed Jirousek with schizoaffective disorder, compulsive personality disorder, anxiety, and intermittent explosive disorder. (Tr. 1131).

On December 17, 2014, Jirousek saw mental health therapist Cathleen McLaughlin at Signature Health. (Tr. 1153, 1263–74). Jirousek told McLaughlin that he was diagnosed with ADHD, schizophrenia, PTSD, and OCD. (Tr. 1263). He told McLaughlin that he was upset

---

[16] A GAF score in the range of 71 to 80 indicates that "if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupation, or school functioning (e.g., temporarily falling behind in schoolwork). AM. PSYCH. ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 30 (4th ed. 2000).

because four companies rejected his job applications and he believed that sex offenders should get a second chance.  (Tr. 1263).  Jirousek described himself as outgoing and friendly, and he stated that he had "many" supportive relationships, including support from his family. (Tr. 1266–67).  Jirousek told McLaughlin that, before going to prison, he left his job at a gym because he wanted to make more money.  (Tr. 1153, 1274).  He stated that he couldn't find a job and "lost it," resulting in his schizophrenia diagnosis.  (Tr. 1153, 1274).  McLaughlin adopted Jirousek's schizoaffective disorder and ADHD diagnoses, and she stated he should be further assessed for borderline personality disorder.  (Tr. 1153, 1274).  She recommended that Jirousek receive psychiatric care and individual counseling.  (Tr. 1153, 1274).

On February 12, 2015, Jirousek saw Luis Ramirez, M.D., at Signature Health.  (Tr. 1154–55).  Dr. Ramirez noted that Jirousek had problems with frustration, anxiety, depression, nightmares, and "[m]aybe some anger."  (Tr. 1155).  Jirousek also had limited judgment and insight.  (Tr. 1155).  Dr. Ramirez prescribed Jirousek Adderall, an antipsychotic medication, and an antidepressant.  (Tr. 1155).  On March 10, 2015, Jirousek reported that he was compliant with his medications, but that his Adderall did not work.  (Tr. 1162).  He also told Dr. Ramirez that he planned to attend graduate school after he became self-sufficient and stable.  (Tr. 1156). Dr. Ramirez noted that Jirousek's mood was stable but blunted.  (Tr. 1162).  At monthly follow-ups from April 7, 2015, through January 7, 2016, Dr. Ramirez noted that Jirousek was medication complaint, stable, "doing well," and free of delusions, hallucinations, or other psychotic symptoms.  (Tr. 1169, 1177, 1184–85, 1193, 1221, 1230, 1237–38, 1246, 1254, 1262). On July 7, 2015, Jirousek told Dr. Ramirez that he could not handle work stress and would get hallucinations from working.  (Tr. 1193).  On September 2, 2015, Jirousek told Dr. Ramirez that he had a panic attack the day before his visit, but that his symptoms had improved with treatment.  (Tr. 1230).  Notwithstanding Jirousek's improvement with treatment, Dr. Ramirez

noted that he continued to have limited judgment and insight, distrusted the legal system, and believed that his probation officer gave exaggerated information to a college that had rejected him. (Tr. 1221, 1246, 1262). On January 7, 2016, Jirousek told Dr. Ramirez that he was studying for college. (Tr. 1262). On April 7, 2016, Dr. Ramirez noted that Jirousek was medication compliant, doing well, had no psychotic symptoms, and continued to have limited judgment and insight. (Tr. 1284). On May 12, 2016, told Dr. Ramirez that he had anxiety related to interpersonal problems that were reported to his probation officer, but he was medication compliant and doing well overall. (Tr. 1311).

On March 5, 2015, Jirousek told his Signature Health case manager that he was interested in working and wanted to find job opportunities related to sports medicine. (Tr. 1203). He told his case manager that he was sleeping well, but he felt anxious on occasion. (Tr. 1203). On April 7, 2015, the case manager noted that Jirousek completed job applications at home, but he had difficulty finding a job due to his felony record. (Tr. 1208).

## C. Relevant Opinion Evidence

### 1. Treating Physician—Luis Ramirez, M.D.

On October 1, 2015, Dr. Ramirez completed a "Medical Source Statement: Patient's Mental Capacity" form. (Tr. 1213–14). Dr. Ramirez indicated that Jirousek could continuously maintain his appearance. (Tr. 1214). He indicated that Jirousek could frequently use judgment; maintain regular attendance and be punctual within customary tolerance; understand, remember, and carry out simple job instructions; behave in an emotionally stable manner; relate predictably in social situations; manage funds and schedules; and leave home on his own. (Tr. 1213–14). Jirousek could occasionally follow work rules; maintain attention and concentration for extended periods of two hour segments; respond appropriately to changes in routine settings; deal with the public; relate to co-workers; interact with supervisors; function independently without

16

redirection; work in coordination with or proximity to others without being distracted or distracting; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember, and carry out complex or detailed job instructions; and socialize. (Tr. 1213–14). The form defined "constant" as "unlimited," "frequent" as "up to 2/3 of a work day," and "occasional" as "up to 1/3 of a work day." (Tr. 1213).

On May 12, 2016, Dr. Ramirez completed another "Medical Source Statement: Patient's Mental Capacity" form. (Tr. 1287–88). Dr. Ramirez's assessment remained generally the same, but with the following changes. (*Compare* Tr. 1213–14, *with* 1287–88). Dr. Ramirez reduced from "frequent" to "occasional" Jirousek's ability to use judgment. (Tr. 1287). He increased from "occasional" to "frequent" Jirousek's ability to respond appropriately to changes in routine settings; work in coordination with or proximity to others without being distracted or distracting; understand, remember, and carry out detailed job instructions; and socialize. (Tr. 1287–88).

On July 26, 2016, Dr. Ramirez wrote a letter, stating only that, "[d]ue to his disability, Mr. Jirousek has been unable to work and continues to be permanently disabled." (Tr. 1319).

### 2. Examining Psychologist—Jeff Rindsberg, Ph.D.

On October 20, 2014, Jirousek saw Jeff Rindsberg, Ph.D., for a consultative examination on referral from the Ohio Division of Disability Determination. (Tr. 1144). Jirousek told Dr. Rindsberg that he applied for benefits because he did not feel "mentally able to hold down a job . . . because of 'all that's happened with prison.'" (Tr. 1144). He told Dr. Rindsberg that he had auditory and olfactory hallucinations, felt "tranquil," and could "feel a panic attack coming on." (Tr. 1145). Jirousek said he had problems with organization, timely completing tasks, and using his money wisely. (Tr. 1145–46). Jirousek reported that he was diagnosed with PTSD

after prison guards sexually assaulted him, but no one believed his claim. (Tr. 1146). Jirousek told Dr. Rindsberg that he did not have any friends, he did everything with his brother, and he never left home aside from being in a dorm at Kent State. (Tr. 1147). He told Dr. Rindsberg that he sometimes did not feel like getting out of bed due to depression, and on a typical day he cooked meals, watched TV, read, walked outside, took care of his hygiene, shopped, and did household chores. (Tr. 1147). He stated that he got angry if things were out of place, he had trouble counting, and he socialized with immigrants. (Tr. 1147). Dr. Rindsberg noted that Jirousek had logical and goal-oriented language, constricted affect, anxiety about the Ebola epidemic, no history of psychosis, no apparent delusions or paranoia, perfect recall, above average intelligence, fair insight, and questionable judgment. (Tr. 1147–48). Jirousek told Dr. Rindsberg that he believed that his civil rights were violated because he could not attend Kent State to get a master's degree due to his felony sex offense. (Tr. 1147–48). Dr. Rindsberg diagnosed Jirousek with schizoaffective disorder and OCD. (Tr. 1148).

In assessing Jirousek's functional capacity, Dr. Rindsberg stated that Jirousek could understand, remember and carry out instructions without difficulty. (Tr. 1148). His depression and difficulty with reality testing could cause problems with maintaining attention and concentration, but he could do simple and multistep tasks. (Tr. 1149). Jirousek's auditory hallucinations could cause problems with his ability to maintain persistence. (Tr. 1149). Because Jirousek "hardly socialize[d]," dealing with people could be a problem. (Tr. 1149). He would also have difficulty handling work pressures, due to his poor reality testing, depression, and low energy. (Tr. 1149). He could not effectively and independently manage funds. (Tr. 1149).

### 3. State Agency Consultants

On November 6, 2014, state agency consultant Jennifer Swain, Psy.D., reviewed Jirousek's medical records and determined that the objective medical records did not show that Jirousek was disabled. (Tr. 79–86, 95–102). Dr. Swain determined that Jirousek's medically determinable mental impairments caused only mild restrictions in his daily living and moderate restrictions in his ability to maintains social functioning, concentration, persistence, and pace. (Tr. 81, 97). Dr. Swain noted that Jirousek's mental health condition was "clouded" by steroid, alcohol, and ecstasy[17] use, but that his mental health was generally stable after his incarceration and forced sobriety. (Tr. 82, 98). She noted that Jirousek was able to maintain stability, handle stress, and engage in productive activities while incarcerated, even though he saw mental health providers only every 90 days and did not take medications. (Tr. 82, 98). Dr. Swain stated that Jirousek would "have difficulty in work-related function, but evidence overall support[ed] no more than moderate limits." (Tr. 83, 99).

In assessing Jirousek's RFC, Dr. Swaine indicated that he had no limitations with memory, understanding, carrying out simple or detailed instructions, sustaining an ordinary routine without special supervision, making simple work-related decisions, asking simple questions, requesting assistance, maintaining socially appropriate behavior, adhering to basic standards of neatness and cleanliness, being aware of normal hazards and taking appropriate precautions, traveling in unfamiliar places, using public transportation, setting realistic goals, and making independent plans. (Tr. 84–86, 100–02). She indicated that Jirousek had sustained

---

[17] Ecstasy is a synthetic stimulant and psychedelic, which causes an increased heart rate and increased levels of dopamine and serotonin. *MDMA (Ecstasy/Molly)*, DRUGFACTS, *available at* Nat'l Inst. on Drug Abuse, DRUGABUSE.GOV, https://www.drugabuse.gov/ publications/drugfacts/mdma-ecstasymolly (last visited Dec. 27, 2018). It is a Schedule 1 substance, meaning that it has no medical benefit and a high potential for abuse. *Id.* Addicts suffering from ecstasy withdrawal often experience fatigue, loss of appetite, depression, and difficulty concentrating. *Id.*

concentration and persistence problems, social interaction limitations, and adaptation limitations. (Tr. 84–85, 100–02). She stated that Jirousek had moderate limitations in maintaining attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, working in coordination with or proximity to others without being distracted, completing a normal workday and workweek without interruptions from psychologically based symptoms, performing at a consistent pace without an unreasonable number and length of rest periods, interacting appropriately with the general public, accepting instructions, responding appropriately to criticism from supervisors, getting along with coworkers without distracting them or exhibiting behavioral extremes, and responding to changes in the work setting. (Tr. 84–86, 100–02). On March 5, 2015, Carl Tishelr, Ph.D., considered additional medical evidence and statements from Jirousek, and concurred with Dr. Swain's opinion. (Tr. 113–20, 129–36).

### D. Relevant Testimonial Evidence

Jirousek testified at the ALJ hearing. (Tr. 45–67). He stated that he lived with his parents and brother, and that he did not have any income other than public assistance. (Tr. 45–46). He had a driver's license, but only drove to the supermarket and church. (Tr. 46). He went to church services for one hour on Sundays. (Tr. 54). Jirousek spent his days watching TV, reading, or listening to music. (Tr. 51). He also exercised at home, and he did not go to a gym because he felt like people were going to attack him. (Tr. 51, 62). His household chores included taking out the trash, cleaning the tables, and cleaning the shower four times per week. (Tr. 51). He did his own laundry. (Tr. 51). He went to the library about twice per month to look up sports news and study Spanish. (Tr. 52). His brother was his only friend, and he saw his brother every day. (Tr. 54). His other friends stopped talking to him after they learned he had mental health issues. (Tr. 65).

In 2009 and 2010, Jirousek worked 28 hours per week as a personal trainer and earned $7 per hour.  (Tr. 48).  He worked part-time for GNC in 2007, and he worked as a lifeguard at various locations from 2003 through 2005.  (Tr. 48–49).  In 2002, he was a restaurant cashier.  (Tr. 51).  Jirousek applied for jobs at restaurants and gyms twice per month, but he did not receive any offers.  (Tr. 47).  Although he qualified for the jobs and "like[d] to try," he believed he could not perform the jobs due to his hallucinations, anxiety, paranoia, elevated heart rate, profuse sweating, lightheadedness, dizziness, and fainting.  (Tr. 53–54).  Any job he got he lost within a year, and he was fired from one of his jobs after his boss noted that he was "always paranoid and antsy."  (Tr. 58).  He stated that he had trouble dealing with other people in the workplace.  (Tr. 59).

In 2009, Jirousek received a bachelor of science in sports medicine.  (Tr. 46).  Since March 2010, Jirousek applied to master's in sports administration programs at Miami University and Texas A&M, and he believed he could have completed the programs if he were accepted.  (Tr. 55–56).  Jirousek stated that he could succeed as a student, despite not being able to succeed at a job, because he felt "at home" in the classroom, liked taking tests, did not have to talk to other students, and valued education.  (Tr. 56, 59).

He had auditory hallucinations four times a day that lasted up to one hour.  (Tr. 59, 63).  Specifically, he heard "evil creature" voices, which told him to kill himself because he was no good, worthless, and hopeless.  (Tr. 59).  He also had weekly olfactory hallucinations, which smelled like burning and caused him to feel like he was "being sucked into another planet."  (Tr. 62–63).  Further, Jirousek said he had memory problems, self-harm ideation, aggression toward his family, anxiety causing him to feel physically unable to do anything, and paranoia.  (Tr. 57–58, 62, 64, 65).  His paranoid delusions caused him to: (1) believe the government would hack his bank account if he had one; (2) fear going to the grocery store or walking in public;

(3) believe that he had bombs in his house; and (4) destroy his computers in fits of aggression. (Tr. 57–58, 65). He said that he had 12 psychiatric admissions, saw Dr. Ramirez once a month for treatment, and took three different medications. (Tr. 55, 64, 66). His treatment helped him stay "semi-stable," and his medications did not cause any side effects. (Tr. 55, 66). Nonetheless, he continued to experience symptoms at the same level. (Tr. 66).

Thomas Nimberger, a vocational expert ("VE"), also testified at the hearing. (Tr. 67–71). The ALJ directed the VE to consider a hypothetical individual with Jirousek's age and education and no past work experience. (Tr. 68). The ALJ asked the VE whether such an individual could perform work if he had no exertional limitations, but was "limited to a work environment with no production-rate based requirements. This person can have occasional interactions with supervisors, coworkers, and the public; and this person can tolerate routine workplace changes. Moreover, this person would be off task 10% of the time in an eight hour work day." (Tr. 68–69). The VE testified that such an individual could work as a custodian/janitor, laundry worker, or packager. (Tr. 69). If the individual were off task 20% of the time, all work would be precluded. (Tr. 69).

Jirousek's attorney asked the VE whether a hypothetical individual with Jirousek's age, education, and work history could work, if he could not have contact with the public, could not exceed 10% contact with coworkers or supervisors, and could only occasionally follow work rules. (Tr. 70). The VE testified that such an individual could not work. (Tr. 70). Jirousek's attorney asked the VE whether a hypothetical individual with Jirousek's age, education, and work history could work if he needed three unscheduled 15-minute breaks each day, in addition to the typical morning, lunch, and afternoon breaks. (Tr. 70). The VE testified that such an individual could not work. (Tr. 70). Jirousek's attorney asked the VE whether a hypothetical individual with Jirousek's age, education, and work history could work if he would be absent

from work two days per month on a regular basis in an unskilled setting. (Tr. 70). The VE testified that such an individual could not work. (Tr. 70–71).

## IV.    The ALJ's Decision

On October 3, 2016, the ALJ issued a decision determining that Jirousek was not disabled and denying his applications for disability insurance benefits and supplemental security income. (Tr. 11–21). The ALJ determined that Jirousek met the insured status requirements of the Social Security Act through March 31, 2011. (Tr. 13). The ALJ found that, although Jirousek worked as a pizza delivery driver after the alleged onset date, his work did not rise to the level of substantial gainful activity. (Tr. 13). The ALJ found that Jirousek had severe impairments: schizoaffective disorder and obsessive-compulsive disorder. (Tr. 13). The ALJ stated that Jirousek's alleged anxiety disorder was not severe because he was not diagnosed with anxiety disorder, and his ADHD was non-severe because it was a "relatively recent[]" diagnosis and was controlled through medications. (Tr. 14). The ALJ also noted that Jirousek's alleged anxiety disorder and ADHD did not cause more than minimal vocational limitations. (Tr. 14). The ALJ found that Jirousek did not have an impairment or combination of impairments that met the severity of any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 14).

The ALJ determined that Jirousek had the RFC:

> to perform a full range of work at all exertional levels, but with the following non-exertional restrictions: the claimant is limited to a work environment with no production rate pace requirements. He can have occasional interaction with supervisors, coworkers, and the public. He can tolerate routine workplace changes. The claimant will be off-task 10% of the time in an eight-hour workday.

(Tr. 16).

In assessing Jirousek's RFC, the ALJ explicitly stated that he "considered all symptoms" in light of the medical and other evidence in the record. (Tr. 16). The ALJ stated that Jirousek's medically determinable impairments could reasonably be expected to cause his alleged

symptoms, but he also found Jirousek's complaints regarding the intensity, persistence, and limiting effects of his symptoms were "not entirely consistent with the medical and other evidence in the record." (Tr. 16). The ALJ noted that Jirousek's mental impairments, including his hallucinations, anxiety, paranoia, irritability, and restlessness, were not disabling when he was properly medicated. (Tr. 16–17). Further, the ALJ noted that Jirousek's difficulty finding work was related to his felony record, rather than his mental impairments, and that he believed he could have pursued a master's degree without interference from his symptoms. (Tr. 17). The ALJ also noted that Jirousek reported that he could perform personal care, clean his room and bathroom, watch football and wrestling, listen to music, prepare meals, shop in stores, read, drive, attend church regularly, do laundry, and use computers at the library to apply for jobs. (Tr. 18).

The ALJ stated that he gave great weight to Dr. Swain's and Dr. Tishler's opinions that Jirousek could sustain a work routine in a setting where there no demands for a rapid pace, social demands are limited, and some flexibility for scheduling breaks is permitted. (Tr. 18). He explained that Dr. Swain's and Dr. Tishler's opinions were consistent with Jirousek's treatment history, Dr. Rindsberg's findings, and Jirousek's reported daily activities. (Tr. 18). The ALJ also noted that Dr. Swain's and Dr. Tishler's opinions were based upon the entire record available at the time they issued their opinions, as well as their expertise in their fields and familiarity with the disability program's requirements. (Tr. 18). The ALJ also gave partial weight to Dr. Rindsberg's opinion because it was "somewhat consistent with [Jirousek's] treatment records" showing that he had poor insight, poor judgment, depression, and anxiety; however, it was inconsistent with records showing that Jirousek had good concentration and memory, logical and coherent thought processes, and no evidence of psychological symptoms for years. (Tr. 18–19).

The ALJ stated that he gave partial weight to Dr. Ramirez's October 2015 and May 2016 opinions, and that he gave little weight to Dr. Ramirez's July 2016 letter. (Tr. 19–20). The ALJ noted that Dr. Ramirez "ha[d] been treating [Jirousek] since February 2015." (Tr. 19). The ALJ determined that Dr. Ramirez's October 2015 and May 2016 opinions were "somewhat consistent with [Jirousek's] treatment records and activities of daily living"; however, "neither opinion [was] disabling" and the opinions were not completely consistent with treatment notes showing that Jirousek was "stable with medication management for several years." (Tr. 19). The ALJ also explained that Dr. Ramirez's July 2016 letter – opining that Jirousek was unable to work and was permanently disabled – was not consistent with Jirousek's daily activities, his assertion that he could succeed at graduate school, Dr. Ramirez's own previous opinions, or the unremarkable mental status examinations over the prior several years. (Tr. 20). He also stated that Dr. Ramirez's July 2016 letter commented on an issue reserved to the Commissioner. (Tr. 20).

Based on Jirousek's RFC, age, education, and experience, the ALJ determined that the Medical-Vocational Guidelines did not direct a finding of "disabled" or "not disabled." (Tr. 20). Thus, the ALJ relied on the VE's testimony to determine that Jirousek could perform a significant number of jobs. (Tr. 21). Such work included: janitor, laundry worker, and packager. (Tr. 21). In light of his findings, the ALJ determined that Jirousek was not disabled from March 15, 2010, through the date of his decision and denied Jirousek's applications for disability insurance benefits and supplemental security income. (Tr. 21).

## V. Law & Analysis

### A. Standard of Review

The court's review is limited to determining whether the ALJ applied proper legal standards and reached a decision supported by substantial evidence. 42 U.S.C. §§ 405(g) and

1383(c)(3); *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence is any relevant evidence, greater than a scintilla, that a reasonable person would accept as adequate to support a conclusion. *Rodgers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Under this standard of review, a court cannot decide the facts anew, make credibility determinations, or re-weigh the evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (providing that, if the Commissioner's findings as to any fact are supported by substantial evidence, those findings are conclusive); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) ("Upon review, we are to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor when testifying."). Even if the court does not agree with the Commissioner's decision, or substantial evidence could support a different result, the court must affirm if the Commissioner's findings are reasonably drawn from the record and supported by substantial evidence. *See Elam*, 348 F.3d at 125 ("The decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Rogers*, 486 F.3d at 241 ("[I]t is not necessary that this court agree with the Commissioner's finding, as long as it is substantially supported in the record."). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Though the court's review is deferential, the court will not uphold the Commissioner's decision if the ALJ failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the

SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, however, we review decisions of administrative agencies for harmless error. Accordingly, . . . we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (citations and quotation omitted)). Furthermore, the court will not uphold a decision, even when supported by substantial evidence, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to supplemental security income or disability benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(i)–(v) and 416.920(a)(4)(i)–

(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). The claimant bears the ultimate burden to produce sufficient evidence to prove that she is disabled and, thus, entitled to benefits. 20 C.F.R. §§ 404.1512(a) and 416.912(a).

### B.    Medical Opinion Evidence

Jirousek argues that the ALJ failed to apply proper legal procedures in weighing treating psychiatrist Dr. Ramirez's opinions, because he did not assess Dr. Ramirez's opinions for controlling weight, failed to give good reasons for rejecting them, and ignored the length of Dr. Ramirez's treatment relationship with Jirousek. ECF Doc. 1387–90, 1392. Jirousek also asserts that substantial evidence did not support the ALJ's conclusion that Dr. Ramirez's opinions were inconsistent with the record evidence and were not disabling, because: (1) Dr. Ramirez's opinions were consistent with each other and evidence showing that he poor insight and judgment, bizarre and delusional behavior, and issues with violence and aggression; and (2) the ALJ improperly relied on Jirousek's grandiose and unrealistic delusions that he could succeed in graduate school, join the air force, sit for the LSAT, and work. *Id.* at 1393–94. Furthermore, Jirousek argues that the ALJ erred giving less scrutiny to the state agency consultants' opinions than he gave to Dr. Ramirez's opinions, and by relying on those opinions to reject Dr. Ramirez's opinions. *Id.* at 1391.

The Commissioner responds that the ALJ adequately explained that he gave partial weight to Dr. Ramirez's opinions because they were not disabling and not completely consistent with record evidence. ECF Doc. 15, Page ID# 1412–13. The Commissioner asserts that the ALJ's conclusion was supported by evidence showing that: (1) Jirousek had relatively unremarkable health examinations; (2) his concentration, mood, thought processes, and lack of psychotic symptoms were relatively intact; and (3) he was stable with medication management. *Id.* at 1413–14. Further, the Commissioner argues that the ALJ properly gave great weight to the

state agency consultants' opinions, because they were consistent with Jirousek's treatment history.  *Id.* at 1414.

At Step Four, an ALJ must weigh every medical opinion that the SSA receives.  20 C.F.R. §§ 404.1527(c), 416.927(c).  An ALJ must give a treating physician's opinion controlling weight, unless the ALJ articulates good reasons for discounting that opinion.  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013).  "Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Id.* (quoting 20 C.F.R. § 404.1527(c)(2)).  If, for example, the physician's opinion "is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record," the ALJ should not give it controlling weight.  SSR 96-2p, 61 Fed. Reg. 34490, 34491 (July 2, 1996), *rescinded by* 82 Fed. Reg. 15263 (Mar. 27, 2017) (effective for claims filled on or after March 27, 2017); *see also* SSR 12-2p, 77 Fed. Reg. at 43641–42.  A treating source's opinion on an issue reserved to the Commissioner, such as the ultimate issue of whether a claimant is disabled, is never assessed for controlling weight.  20 C.F.R. §§ 404.1527(d), 416.927(d).  Nevertheless, "opinions from any medical source on issues reserved to the Commissioner must never be ignored," and should be evaluated according to the same criteria as a non-controlling treating source opinion.  SSR 96-5p, 61 Fed. Reg. 34471, 34472–73 (July 2, 1996), *rescinded by* 82 Fed. Reg. 15263 (Mar. 27, 2017) (effective for claims filled on or after March 27, 2017).

If an ALJ does not give a treating physician's opinion controlling weight, he must determine the weight it is due by considering the length of the length and frequency of treatment, the supportability of the opinion, the consistency of the opinion with the record as a whole, and

whether the treating physician is a specialist.  *See Gayheart*, 710 F.3d at 376; 20 C.F.R.

§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).  The ALJ must provide an explanation "sufficiently

specific to make clear to any subsequent reviewers the weight the [ALJ] gave to the treating

source's medical opinion and the reasons for that weight."  *Gayheart*, 710 F.3d at 376; *see also*

*Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) ("In addition to balancing the factors to

determine what weight to give a treating source opinion denied controlling weight, the agency

specifically requires the ALJ to give good reasons for the weight he actually assigned.").

Nevertheless, nothing in the regulations requires the ALJ to explain how he considered each of

the factors.  *See* 20 C.F.R. §§ 404.1527(c), 416.927(c); *see also Francis v. Comm'r of Soc. Sec.*,

414 F. App'x 802, 804–05 (6th Cir. 2011) (noting that the regulations do not require "an

exhaustive factor-by-factor analysis," so long as the ALJ has complied with the regulations'

procedural safeguard by stating good reasons for the weight given to the treating source's

opinion).  Further, nothing in the regulations requires the ALJ to bifurcate his controlling weight

and non-controlling weight analyses.  *Cf. Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th

Cir. 2009) (holding that an ALJ's one-sentence rejection of a treating physician's opinion

satisfied section 404.1527(d)(2)'s "good reasons" requirement); *Bledsoe v. Barnhart*, 165 F.

App'x 408, 412 (6th Cir. 2006) ("The ALJ reasoned that Dr. Lin's conclusions are 'not well

supported by the overall evidence of record and are inconsistent with other medical evidence of

record.'  This is a specific reason for not affording controlling weight to Dr. Lin.").

An ALJ may rely on a physician's medical opinion, regardless of whether the physician

examined the claimant or merely reviewed then-existing medical records.  *See McGrew v.*

*Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009).  Nonetheless, "opinions from

nontreating and nonexamining sources are never assessed for 'controlling weight.'"  *Gayheart*,

710 F.3d at 376.  Instead, an ALJ must weigh such opinions based on: (1) the examining

relationship; (2) the degree to which supporting explanations consider pertinent evidence; (3) the opinion's consistency with the record as a whole; (4) the physician's specialization related to the medical issues discussed; and (5) any other factors that tend to support or contradict the medical opinion. *Id.*; 20 C.F.R. § 416.927(c). An ALJ may rely on a state agency consultant's opinion and may give such opinions greater weight than other nontreating physicians' opinions if they are supported by the evidence. *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 274 (6th Cir. 2015). If the state agency consultant's opinion predates other medical evidence in the record, or the claimant's condition changed after the consultant issued her opinion, an ALJ may rely on that opinion so long as he considers all the medical evidence in the record. *See McGrew*, 343 F. App'x at 32 (holding that an ALJ could rely on a state agency consultant's opinion when the ALJ also considered the medical examinations that occurred after the consultant's assessment).

The ALJ applied proper legal standards in weighing Dr. Ramirez's and the state agency consultants' opinions. The ALJ complied with the regulations by evaluating all the opinion evidence in light of the entire medical record, and clearly stating the weight given to each medical opinion. *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; 20 C.F.R. §§ 404.1527(c), 416.927(c); (Tr. 16, 18–20). The ALJ also articulated good reasons for giving Dr. Ramirez's opinions partial and little weight, when he explained that: (1) Dr. Ramirez's October 2015 and May 2016 opinions were not completely consistent with the other medical evidence and Dr. Ramirez's own treatment notes; and (2) Dr. Ramirez's July 2016 letter was commentary on an issue reserved to the commissioner and inconsistent with Jirousek's testimony regarding his daily activities and ability to succeed at school, as well as Jirousek's unremarkable mental status examinations and Dr. Ramirez's own notes. *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; 20 C.F.R. §§ 404.1527(c), 416.927(c); (Tr. 19–20). Here, the regulations did not require the ALJ to give a lengthy discussion regarding his reasons, explicitly discuss each factor, or bifurcate his

controlling weight and noncontrolling weight analyses, as his discussion was sufficient to explain the reasons he gave Dr. Ramirez's opinions partial and little weight. *Gayheart*, 710 F.3d at 376; *Cole*, 661 F.3d at 938; *Francis*, 414 F. App'x at 804–05; *Allen*, 561 F.3d at 651; *Bledsoe*, 165 F. App'x at 412. Furthermore, the ALJ did not improperly rely on the state agency consultants' opinions, or give them inadequate scrutiny, as the ALJ: (1) evaluated the state agency consultants' opinions based on the regulatory factors; and (2) considered the outdated opinions in light of all the record evidence. *Gayheart*, 710 F.3d at 376; *Reeves*, 618 F. App'x at 274; *McGrew*, 343 F. App'x at 32; 20 C.F.R §§ 404.1527(c), 416.927(c); (Tr. 18–19).

Substantial evidence also supported the ALJ's conclusion that Dr. Ramirez's opinions were not entirely consistent with record evidence. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.2d at 125; *Kinsella*, 708 F.2d at 1059. Here, evidence in the record supported the ALJ's conclusion Dr. Ramirez's opinions were inconsistent with Jirousek's ability to maintain stability and improve with medication, including: (1) Dr. Ramirez's and Dr. Mann's notes showing that Jirousek improved with treatment; (2) several treatment provider's notes that he had better judgment and was cooperative, logical, coherent, and less aggressive while compliant with his treatment; and (3) notes indicating that he did worse mostly when he was non-compliant with his treatment and medication. (Tr. 343, 345–46, 396, 404, 412, 490–92, 494–95, 507, 509, 524, 532, 629, 639, 838, 857, 1026, 1121, 1127, 1230, 1284, 1311). Evidence also supported the ALJ's conclusion that Dr. Ramirez's opinions were inconsistent with Jirousek's testimony regarding his abilities, including ability to: (1) study and be successful in a graduate program; (2) complete all his household chores; (3) sustain concentration to watch TV and read; (4) maintain a strict workout routine; (5) maintain his relationship with his brother; and (6) attend church services and grocery shop. (Tr. 46, 51–52, 54–56, 59, 62). Even though this court on *de novo* review

might have given less weight to Jirousek's own representations regarding his ability to succeed,[18] the ALJ was permitted to rely on Jirousek's testimony as substantial evidence supporting his conclusions without this court second-guessing the weight given to it. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241. Thus, even if the evidence in the record could support a different result, and even if that result would be more appealing to the court, the ALJ's decision to give Dr. Ramirez's opinions partial and little weight falls within the Commissioner's "zone of choice" because his conclusions were reasonably drawn from the record. *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241; *Mullen*, 800 F.3d at 545.

## C.      The ALJ's Disability Determination

Jirousek argues that the ALJ made an improper medical judgment and "ignored [a] multitude of evidence" in determining that: (1) he could occasionally interact with coworkers, supervisors, and the public; and (2) medication management allowed him to be stable for years. ECF Doc. 14, Page ID# 1395–97. He asserts that substantial evidence did not support the ALJ's conclusion, but instead showed that he was not able to interact appropriately with others or sustain the concentration, persistence or pace required for competitive employment. *Id.* at 1395, 1397. Jirousek also contends that evidence does not support the ALJ's conclusion that his condition improved with medication. *Id.* at 1396–97. Finally, he argues that he could not perform any work, because he would be off-task for more than 20% of the workday and could not interact with others for more than 10% of the workday. *Id.* at 1397.

---

[18] The court notes that, although Jirousek's belief in his ability to succeed academically may be a manifestation of his grandiose delusions, the record indicates that his criminal record – not his lack of ability – is the primary factor impeding his academic goals. (*See* Tr. 1124, 1208, 1263).

The Commissioner responds that the ALJ did not "play doctor" or distort the facts by cherry-picking evidence in evaluating Jirousek's RFC, but instead properly engaged in an analysis reserved for the Commissioner. ECF Doc. 15, Page ID# 1415–16. Further, the Commissioner argues that substantial evidence supported the ALJ's RFC determination, as evidence showed that Jirousek's condition improved when he was compliant with medications. *Id.* at 1413–16.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. §§ 404.1520(e), 416.920(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 4, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by *all* of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 61 Fed. Reg. at 34477. Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 416.929(a).

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence supporting the contention that the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). An ALJ may determine that a clamant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs. *Howard*, 276 F.3d at 238. A VE's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC. *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a

'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments'" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations"). "An ALJ is only required to incorporate into a hypothetical question those limitations he finds credible." *Lee*, 529 F. App'x at 715; *see also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

Jirousek's challenge of the ALJ's RFC determination and conclusion that he was not disabled is unavailing. The ALJ applied proper legal procedures and reached a decision supported by substantial evidence in determining that Jirousek had the RFC to perform a range of work at any exertional level, notwithstanding his mental impairments. 42 U.S.C. §§ 405(g), 1383(c)(3); *Elam*, 348 F.3d at 125; *Kinsella*, 708 F.2d at 1059. Here, the ALJ followed proper legal procedures by considering all of Jirousek's impairments, severe or otherwise, in light of the medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 416.920(e), 416.929(a); SSR 96-8p, 61 Fed. Reg. at 34477; (Tr. 15–20). Although Jirousek claims that the ALJ ignored a "multitude of evidence" regarding his ability to interact appropriately with others in evaluating his RFC, he does not specifically identify any evidence that the ALJ failed to consider. (ECF Doc. 14, Page ID# 1395). Furthermore, the record shows that the ALJ considered such evidence, including "recent medical records show[ing] . . . [t]he claimant was generally pleasant and cooperative." (Tr. 17). Moreover, substantial evidence supports the ALJ's findings that Jirousek was stable for years, could sustain concentration sufficient to work, and could occasionally interact with coworkers, supervisors, and the public, including: (1) several treatment providers' notes indicating that he was calm, cooperative, logical, coherent, goal-directed, and less

aggressive when compliant with treatment; (2) Jirousek's own testimony regarding his ability to study, complete job applications, and succeed academically; (3) Jirousek's testimony that his medication and mental health treatment helped him stay "semi-stable"; (4) his lack of psychiatric admissions since last admission in February 2012; and (5) notes indicating that he was stable or improved with medications and did worse only when noncompliant with treatment. (Tr. 46–47, 52, 55–56, 59, 343, 345–46, 396, 404, 412, 490–92, 494–95, 509, 524, 532, 629, 639, 838, 857, 1026, 1121, 1127, 1230, 1266–67, 1284, 1311). Thus, the court may not disturb the ALJ's conclusion that Jirousek could perform a range of work at any exertional level, notwithstanding his mental impairments. 42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 f.3d at 241; *Walton*, 773 F. Supp. 2d at 747.

Finally, Jirousek's argument that the VE's testimony indicated that he could not work because he would be off task for more than 20% of the workday is unavailing, as the ALJ did not and was not required to include such a restriction in his RFC determination, and any testimony that the VE gave regarding a hypothetical individual with such a limitation upon cross-examination is not substantial evidence if inconsistent with an appropriately-determined RFC. *Howard*, 276 F.3d at 238; *Lee*, 529 F. App'x at 715; *Blacha*, 927 F.2d at 231; 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v); (ECF Doc. 14, Page ID# 1397); (Tr. 16, 70–71). The ALJ properly concluded that Jirousek was not disabled under the Social Security Act and the court may not disturb the ALJ's decision denying Jirousek's applications for disability insurance benefits and supplemental security income. 42 U.S.C. §§ 405(g), 1383(c)(3); *Jones*, 336 F.3d at 476; *Elam*, 348 F.3d at 125; *Rogers*, 486 F.3d at 241.

## VI.     Conclusion

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, the Commissioner's final decision denying Jirousek's applications for disability insurance benefits and supplemental security income is AFFIRMED.

IT IS SO ORDERED.

Dated: January 3, 2019

Thomas M. Parker
United States Magistrate Judge